**WALTREE LIMITED, Plaintiff,**

v.

**ING FURMAN SELZ LLC, ING Bank N.V. and Stuart Kasdin, Defendants.**

**No. 99 CIV 9935 SAS.**

United States District Court, S.D. New York.

May 10, 2000.

Amy W. Schulman, Rita C. Burghardt, Piper, Marbury Rudnick & Wolfe L.L.P., New York City, for plaintiff.

Peter E. Calamari, David E. Mollon, Winston & Strawn, New York City, for defendants.

### *MEMORANDUM OPINION & ORDER*

SCHEINDLIN, District Judge.

This is a securities fraud action in which plaintiff Waltree Limited ("Waltree") alleges that defendants ING Barings LLC ("ING Barings") [1], ING Bank N.V. ("ING Bank") and Stuart Kasdin fraudulently induced it to purchase certain high-yield debt instruments in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and section 12(a)(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77*l*(a)(2). Plaintiff also brings a related state law fraud claim.

Defendants now move to dismiss the First Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted, and pursuant to Federal Rule of Civil Proce-

---

1. ING Barings was formerly known as "ING Furman Selz LLC". Although the predecessor company's name appears in the caption, this Memorandum Opinion refers to the current entity, ING Barings.

dure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), 15 U.S.C. § 78u–4 (1999), for failure to plead fraud with particularity.[2] With one exception, defendants' motion is denied.

## I. Legal Standard

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of N.Y.*, 186 F.3d 243, 247 (2d Cir.1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." · *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (internal quotations omitted). To properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Harris*, 186 F.3d at 247.

Rule 9(b) sets forth additional pleading requirements with respect to allegations of fraud. Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." But, under Rule 9(b), "malice, intent, knowledge and other condition of mind of a person may be averred generally."

■ Securities fraud actions are subject to the requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). However, the Reform Act heightened that Rule's requirement for pleading scienter. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, plaintiffs must " 'state with particularity facts giving rise to· a strong inference that the defendant acted with the required state of mind.' " *Press*, 166 F.3d at 538 (quoting 15 U.S.C. § 78u–4(b)(3)(A)).

## II. Background

The Complaint describes a complicated series of business transactions involving plaintiff, defendants and the Republic of Tatarstan ("Tatarstan"). For purposes of resolving defendants' pending motion, it is unnecessary to recount the challenged transactions in detail. Rather, a brief summary suffices at this preliminary stage.[3]

Plaintiff Waltree is a limited liability company incorporated under the laws of Ireland. Complaint ¶ 1. Defendant ING Bank is a Netherlands corporation with its principal place of business in Amsterdam. *Id.* ¶ 2. The bank also maintains an office in New York, New York. *Id.* Defendant ING Barings is a Delaware corporation with its principal place of business in New York, New York. *Id.*[4] At all relevant times, defendant Kasdin was a Vice President of either ING Bank or ING Barings. *Id.* ¶¶ 2, 6.[5]

In early 1998, ING Bank agreed to loan $100,000,000 to Tatarstan (the "Loan"). *Id.* ¶¶ 8–9. In order to finance the Loan, ING Bank and ING Barings planned to

2. In the event plaintiff's federal law claims are dismissed, defendants additionally seek to dismiss plaintiff's state law claim pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

3. The background facts and allegations are taken from the Complaint. They are presumed true for purposes of resolving defendants' motion.

4. The corporate relationship between ING Bank and ING Barings (collectively, the "ING entities") is not addressed in the Complaint.

5. At this preliminary stage, plaintiff is apparently unable to identify which ING entity Kasdin was associated with during the time of the challenged transactions. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Opp.") at 16.

issue a series of high-yield debt instruments (the "Notes"). *Id.* The Notes were to be issued by ING Bank and placed by ING Barings. *Id.* ¶ 8.

In May 1998, Kasdin, at the direction of either ING Bank or ING Barings, contacted Waltree and made a sales pitch regarding the Notes. *Id.* ¶¶ 8, 10–12. Kasdin informed Waltree that the Notes would bear interest at a rate of 14.5% per annum and mature within six months of investment. *Id.* ¶ 11. Kasdin and others at the ING entities described the Notes as a "good", "stable" and "safe" investment because, among other things, the time to maturity was less than six months. *Id.* ¶ 12. On May 20, 1998, relying on Kasdin's representations and the representations of others at the ING entities, Waltree invested $2.3 million in the Notes. *Id.* ¶ 19.

Waltree now claims that defendants failed to disclose the following material information in connection with the Notes:

(1) The Notes were linked to other debts of Tatarstan and subject to a "Cross–Default" provision. Under the Cross–Default provision, if Tatarstan defaulted on any debt in an aggregate amount of $10,000,000, such default would be considered an "Event of Default" under the Notes. *Id.* ¶ 14.

(2) The Notes were subject to a "Recovery Amount" clause which provided that, upon occurrence of an Event of Default, defendants had sole discretion to redeem the Notes at a recovery amount based on present market value. *Id.* ¶ 15.

(3) At the time it issued and placed the Notes, ING Bank and ING Barings served as financial advisors to Tatarstan. ING Bank and ING Barings received fees for their services. *Id.* ¶ 16.

Waltree alleges that defendants failed to disclose this information during oral discussions leading up to Waltree's decision to invest in the Notes. *Id.* ¶¶ 14–16. Waltree also alleges that "it did not receive an Offering Circular, Term Sheet or other informational documents about the Notes" until January 14, 1999—almost eight months after Waltree purchased the Notes. *Id.* ¶ 17.

Following plaintiff's purchase of the Notes, the ING entities advised plaintiff that a financial crisis in the Russian Federation necessitated a restructuring of payments due on the Notes. *Id.* ¶ 20. On October 14, 1998, plaintiff and the other Noteholders agreed to the proposed restructuring. *Id.* ¶ 21. The Complaint alleges that during this time period, ING Bank and ING Barings continued to perform "the dual and conflicting roles of providing financial advice to [Tatarstan] while purportedly working with the Noteholders to shape an acceptable restructuring of the Loan." *Id.* ¶ 22.

On November 19, 1998, the Prime Minister of Tatarstan sent plaintiff and the other Noteholders a letter stating that Tatarstan was unable to repay the Loan either as scheduled or under the proposed restructuring. *Id.* ¶ 24. The Prime Minister blamed Tatarstan's inability to meet its debt obligations on flawed assumptions and projections underlying the Loan. *Id.* The ING entities' role in formulating those flawed projections, or in Tatarstan's decision not to proceed with the restructuring, was never disclosed. *Id.*

Four days later, on November 24, 1998, the ING entities notified plaintiff that they had set the default Recovery Amount at $2,000 per $100,000 Note. *Id.* ¶ 27. Pursuant to this determination, the ING entities tendered payment of $46,0000 to Waltree in full satisfaction of the Notes. *Id.* ¶ 28. The $46,000 payment represented 2% of Waltree's initial $2.3 million investment. *Id.*

In January 1999, in an apparent attempt to recoup their losses, Waltree and the other Noteholders again agreed to participate in a restructured loan to Tatarstan. *Id.* ¶ 29. The restructuring was set forth in a "Participation Agreement" between

ING Bank and the Noteholders. *Id.* The Complaint alleges that the ING entities' undisclosed relationship with Tatarstan improperly influenced the terms of the Participation Agreement. *Id.* ¶¶ 29–31. Specifically, the Complaint asserts that the Participation Agreement was drafted by attorneys for the ING entities, and that it included terms that were more favorable to Tatarstan and the ING entities than to the Noteholders. *Id.* Plaintiff alleges that had it known of the ING entities' dual role, it would not have entered into the Participation Agreement. *Id.* ¶ 31.

On November 19, 1999, plaintiff filed the instant Complaint alleging violations of § 10(b) and § 12(a)(2) as well as common law fraud. The gravamen of the Complaint is that defendants purposefully failed to disclose material information in connection with the Notes and the Participation Agreement in order to induce plaintiff to invest in those transactions. *Id.* ¶¶ 33–34. The Complaint alleges that defendants' bad acts defrauded and harmed plaintiff while benefitting defendants and Tatarstan. *Id.* ¶ 32. Plaintiff seeks compensatory and punitive damages together with recission of its Note purchases.

## III. Discussion

### A. Claim I: Section 10(b) and Rule 10b–5

■ To state a claim under § 10(b) and Rule 10b–5, plaintiff must allege that in connection with the purchase or sale of securities: (1) defendants made a false material representation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiff detrimentally relied upon defendants' fraudulent acts. *See Press,* 166 F.3d at 534. In addition, plaintiff must allege elements one and two—fraudulent acts and scienter— with particularity in order to meet the heightened pleading requirements set forth in Rule 9(b) and the Reform Act.

■ After carefully reviewing the Complaint, I conclude that, at this nascent stage of the litigation, plaintiff has adequately stated a claim under § 10(b) and Rule 10b–5. Among other things, the Complaint alleges that in connection with the sale of the Notes, defendants concealed material information regarding the Cross–Default and Recovery Amount provisions. In addition, defendants failed to disclose that before, during and after the challenged transactions they were employed as financial advisors to Tatarstan. Defendants' alleged concealment of material terms of the Notes as well as their failure to disclose that the ING entities were operating on both sides of the challenged transactions constitute actionable omissions sufficient to support a claim for securities fraud.

■ Plaintiff also adequately alleges scienter. Rule 9(b) and the Reform Act require securities fraud plaintiffs to state with particularity facts giving rise to "a strong inference" that the defendant acted with fraudulent intent. *See Press,* 166 F.3d at 538. To demonstrate an inference of fraudulent intent, a plaintiff must allege either (1) motive and opportunity to commit fraud; or (2) circumstantial evidence of conscious misbehavior or recklessness. *See id.* In the instant case, plaintiff has pleaded facts constituting strong circumstantial evidence of conscious misbehavior and recklessness, including defendants' concealment of material terms of the Notes and defendants' failure to disclose the ING entities' conflicting role as paid advisors to Tatarstan. Plaintiff has therefore satisfied the pleading requirements of Rule 9(b) and the Reform Act with respect to the element of scienter.

Finally, plaintiff has adequately alleged detrimental reliance. The Complaint asserts that plaintiff relied upon defendants' fraudulent and incomplete representations when it purchased the Notes and entered into the Participation Agreement and that defendants' actions were the proximate cause of plaintiff's harm.

■ In their motion to dismiss, defendants contend that plaintiff has failed to adequately plead any of the required elements of a § 10(b) claim. *See* Memorandum in Support of Defendants' Motion to Dismiss the Amended Complaint ("Def.Mem."). I have considered defendants' arguments and find them to be without merit at the motion to dismiss stage. I note, however, that defendants have highlighted serious weaknesses in plaintiff's § 10(b) claim. For example, defendants discuss the implausibility of a sophisticated institutional investor such as Waltree entering into a $2.3 million transaction without demanding to see a note purchase agreement or some other document setting forth the terms of the transaction. *Id.* at 17–18. Because defendants' argument goes to the merits rather than to the legal feasibility of the Complaint, it is unavailing at this juncture. However, if facts are discovered which demonstrate that plaintiff reviewed information setting forth the terms of the Notes—or that plaintiff was given access to information regarding the Notes but failed to review it—defendants may challenge plaintiff's reasonable reliance (and any other legal deficiencies) at the summary judgment stage.[6]

6. Defendants also raise legitimate concerns regarding plaintiff's failure to differentiate between the fraudulent actions of ING Bank and those of ING Barings. *See* Def. Mem. at 10–11. As defendants correctly assert, the Complaint "simply lumps ING Barings and ING Bank N.V. together in the first paragraph and from then on refers to them as if they were one entity." *Id.* at 10.

As a general matter, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). However, "group pleading" is permissible when "the facts are exclusively within the defendant's knowledge, as is the case when defendants are insiders or affiliates participating in the statements at issue." *In re Health Management, Inc. Secs. Litig.,* 970 F.Supp. 192, 208 (E.D.N.Y.1997). Although it is a close call, I find that group pleading is

**B. Claim II: Section 12(a)(2)**

In Claim II of the Complaint, plaintiff alleges that defendants violated § 12(a)(2) of the 1933 Act. Section 12(a)(2) provides as follows:

Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable ... to the person purchasing such security from him.

15 U.S.C. § 77*l*(a)(2). Despite its seemingly broad language, § 12(a)(2) encompasses a narrow category of transactions—public offerings of securities via a written prospectus. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 567–68, 577–78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Hudson Venture Partners v. Patriot Aviation Group, Inc.,* 98 Civ. 4132, 1999 WL 76803, *2 (S.D.N.Y. Feb 17, 1999).[7] A plaintiff may maintain a claim under § 12(a)(2) only where it complains of misstatements in a prospectus or in "oral communications that relate to a prospectus." *Gustafson,* 513 U.S. at 567–68, 115 S.Ct. 1061.

appropriate here for the following reasons. *First,* facts surrounding the corporate relationship between the ING entities, as well as the precise roles those entities played in the challenged transactions, is exclusively within those entities' knowledge. *Second,* there is little dispute that both ING entities were intimately involved in the Loan and the issuance of the Notes. Accordingly, those companies are "insiders" with respect to the challenged transactions. *Third,* the Complaint puts the ING entities on sufficient notice regarding the charges against them. Among other things, both are accused of failing to disclose material terms of the Notes and their positions as paid financial advisors to Tatarstan.

7. In *Gustafson,* the Supreme Court defined "prospectus" for purposes of § 12(a)(2) as a document that "describes a public offering of securities." 513 U.S. at 584, 115 S.Ct. 1061.

In the instant case, plaintiff contends that "[u]pon information and belief, the Notes were sold pursuant to a 'public offering.'" Complaint ¶ 49. However, plaintiff fails to set forth a single factual allegation which would support this bare and conclusory assertion. More fundamentally, the Complaint does not allege the existence of a prospectus. Nor does it reference oral communications relating to a prospectus. Absent such allegations, plaintiff cannot maintain a claim under § 12(a)(2). *See, e.g., Dietrich v. Bauer,* 76 F.Supp.2d 312, 331 (S.D.N.Y.1999)(dismissing § 12(a)(2) claim where plaintiff failed to "allege the existence of a 'prospectus'" or "oral statements made by the Defendants which relate to a prospectus"). Plaintiff's § 12(a)(2) claim is dismissed.[8]

### C.  Claim III:  Common Law Fraud

Defendants argue that plaintiff's common law fraud claim should be dismissed because it suffers from the same pleading deficiencies as plaintiff's § 10(b) and Rule 10b–5 claims. However, as set forth above, plaintiff has properly stated a claim under § 10(b). Thus, at this early stage, plaintiff's common law fraud allegations are adequately pleaded.[9]

Alternatively, defendants assert that plaintiff's common law fraud claim should be dismissed because it is nothing more than a breach of contract claim disguised as tort. Defendants' argument is meritless. This action does not involve any supposed breach of contract by defendants; rather, it alleges that defendants fraudulently induced plaintiff to invest $2.3 million in high-yield debt instruments by making material misrepresentations and concealing material information. The only "breach" is Tatarstan's failure to make payments as required under the terms of the Notes. However, Tatarstan is not a defendant in this action.[10]

### D.  Punitive Damages

In connection with its common law fraud claim, plaintiff seeks punitive damages alleging that "defendants' conduct was malicious, intentional and undertaken in bad faith with a conscious indifference to Waltree's rights as well as the rights of the other investors in the Notes." Complaint ¶ 62. Defendants argue that under New York law plaintiff is not legally entitled to punitive damages.[11] Defendants are wrong.

Under New York law, punitive damages are available in a tort action where "the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton." *Swersky v. Dreyer & Traub,* 219 A.D.2d 321, 643 N.Y.S.2d 33, 38 (1st Dep't 1996). Whether to award punitive damages based on these factors is a question of fact for the jury. *See id.* Although unlikely, a reasonable juror might find defendants' conduct to be so morally reprehensible and outrageous as to justify an award of punitive damages. According-

---

8.  Plaintiff argues that the public nature of the challenged transactions is an issue of fact to be determined at a later stage in the proceedings. *See* Pl. Opp. at 22–24. Although this may be true where a plaintiff has alleged the existence of a prospectus, plaintiff here has failed to satisfy even that threshold requirement.

9.  In addition, because plaintiff's § 10(b) claim survives dismissal, this Court chooses to exercise subject matter jurisdiction over the related state law claim.

10.  According to defendants, "Plaintiff's allegations boil down to the claim that Defendants' actions violated the parties' agreement because Plaintiff did not know about the 'Cross Default' clause or the 'Recovery Amount' clause." Def. Mem. at 20. To state the argument is to refute it. Defendants' concealment of the Cross Default and Recovery Amount clauses has absolutely nothing to do with a "violation" of those provisions or any other provisions of the Note transaction.

11.  Both parties agree that New York law governs the instant dispute.

**471**

ly, plaintiff's claims are sufficient to sustain a request for such damages.

In seeking to strike plaintiff's request for punitive damages, defendants argue that such damages are only available where the challenged conduct is "part of a pattern directed at the public generally". Def. Mem. at 25. However, the line of cases upon which defendants rely for this proposition is inapplicable. Those cases address the "pleading elements required to state a claim for punitive damages as an additional and exemplary remedy *when the claim arises from a breach of contract.*" *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)(emphasis added)(citing *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 613–14, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994)). As set forth above, the instant action does not "arise from a breach of contract". Plaintiff's fraud claim constitutes an independent tort, and therefore plaintiff need not allege that defendants' conduct harmed the general public in order to properly seek punitive damages.

## IV. Leave to Amend

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend a complaint "shall be freely given when justice so requires". *See also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991)("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). In keeping with the liberal spirit of Rule 15, plaintiff may amend its § 12(a)(2) claim if it can allege facts that will cure the defects set forth herein. Moreover, in determining whether to amend this claim, plaintiff should be mindful of the Reform Act's requirement of a mandatory Rule 11 review at the conclusion of any case.

## V. Conclusion

For the foregoing reasons, defendants' motion is granted with respect to plaintiff's § 12(a)(2) claim. That claim is dismissed with leave to replead. Defendants' motion is denied in all other respects. Any amended complaint must be served and filed no later than twenty-one days from the date of this Order. A status conference is scheduled for June 8, 2000 at 4:30 p.m.

SO ORDERED.